Slip Op. 25-20

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PRECISION COMPONENTS, INC., | |
| Plaintiff, | |
| v. | Before: Joseph A. Laroski, Jr., Judge |
| UNITED STATES, | Court No. 23-00218 |
| Defendant, | |

## OPINION

[Denying Plaintiff's Motion for Judgment on the Agency Record and sustaining the U.S. Department of Commerce's determination interpreting the scope of the antidumping duty order on tapered roller bearings from China.]

Dated: <u>February 25, 2025</u>

<u>David J. Craven</u>, Craven Trade Law LLC, of Chicago, IL, argued for plaintiff Precision Components, Inc.

<u>Geoffrey M. Long</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant United States. With him on the brief were <u>Brian M. Boynton</u>, Principal Deputy Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>L. Misha Preheim</u>, Assistant Director. Of counsel was <u>Jesus N. Saenz</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Laroski, Judge: This action is a challenge to the final scope ruling of the U.S.

Department of Commerce ("Commerce") regarding certain low-carbon steel blanks

(the "merchandise") imported from the People's Republic of China ("China") by

Precision Components, Inc. ("Precision"). Commerce's final scope ruling found that

the merchandise is covered by the antidumping duty order on tapered roller

bearings, including finished and unfinished parts thereof, from China.  <u>Final Scope
Ruling on Precision Components, Inc.'s Low-Carbon Steel Blanks</u>, P.R. 22 (Sept. 19,
2023) ("<u>2023 Scope Ruling</u>"); <u>see also</u> <u>Antidumping Duty Order on Tapered Roller
Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of
China</u>, 52 Fed. Reg. 22,667 (June 15, 1987), <u>as amended</u>, <u>Tapered Roller Bearings
from the People's Republic of China; Amendment to Final Determination of Sales at
Less than Fair Value and Antidumping Duty Order in Accordance with Decision
Upon Remand</u>, 55 Fed. Reg. 6,669 (Feb. 26, 1990) (the "Order").  Commerce
concluded that the merchandise falls within the scope of the Order based on its
consideration of interpretive sources specified by 19 C.F.R. 351.225(k)(1), including
a 2020 scope ruling regarding steel blanks imported by Precision.  <u>Final Scope
Ruling on Precision Components, Inc.'s Green Machined but Not Heat-Treated
Components</u>, P.R. 10 ("<u>2020 Scope Ruling</u>").  Precision brought this action against
the United States (the "Government") to challenge Commerce's final scope ruling.
Based on Commerce's alleged failure to reach a decision regarding the merchandise
that is supported by substantial evidence and otherwise in accordance with law,
Precision moves for judgment on the agency record and asks the court to remand
proceedings to Commerce.  The Government opposes Precision's motion and asks
the court to sustain Commerce's final scope ruling.  For the reasons detailed below,
the court agrees with the Government.  Plaintiff's Motion for Judgment on the
Agency Record is denied, and Commerce's determination is sustained.

## BACKGROUND

### I.    The Order

On June 15, 1987, Commerce issued the Order.  See Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China, 52 Fed. Reg. 22,667 (June 15, 1987); 2023 Scope Ruling; 2020 Scope Ruling at 1.  In the Order and later scope inquiries involving products imported by Precision, Commerce has described the scope, in part, as "tapered roller bearings and parts thereof, finished and unfinished, from China." 2023 Scope Ruling at 6; 2020 Scope Ruling at 2.

### II.    Scope Inquiry Proceedings

#### A.    2020 Scope Ruling: Green-Machined but Not Heat-Treated

In 2020, Precision requested that Commerce issue a scope ruling on cups, cones, and rollers that are silver metallic in color and green-machined, but not heat-treated, at the time of importation into the United States (the "2020 merchandise"). See Scope Ruling Application, P.R. 10 at 1 (Feb. 6, 2020) ("2020 Application"); 2020 Scope Ruling at 1–2.  After considering comments from interested parties, Commerce performed an extensive analysis of the interpretive sources specified by section 351.225(k)(1) and the factors specified by subsection (k)(2).  2020 Scope Ruling at 3–12.  Commerce concluded that the 2020 merchandise was within the scope of the Order.  Id. at 11.

In reaching its conclusion, Commerce first reasoned there was sufficient ambiguity between the plain language of the Order, a related final determination of the International Trade Commission ("ITC"), and related scope rulings to require consideration of the factors set forth in section 351.225(k)(2).  Id. at 7–11. Noting its obligations under that provision, Commerce then evaluated (a) the physical characteristics of the 2020 merchandise, (b) its ultimate uses, (c) the expectations of the ultimate purchasers, (d) the channels of trade, and (e) the manner of advertising and display, concluding that each of these factors supported a finding that the products were within the scope.  Id. at 8–11.

Concerning physical characteristics, Commerce noted that, notwithstanding Precision's characterization of heat treatment as a transformative process, the 2020 merchandise already had the physical characteristics of unfinished tapered roller bearings ("TRBs") or parts thereof.  Id. at 8.  In Commerce's words, even prior to heat treatment, the 2020 merchandise was "very close to [its] final form."  Id.

With respect to the remaining factors, Commerce observed that Precision had failed to articulate any scenario in which the 2020 merchandise would be imported and subsequently processed for an end-use other than the manufacture of TRBs.  Id. at 8–10.  Consequently, Commerce concluded none of the factors suggested the 2020 merchandise was anything other than an "unfinished TRB[]."  Id. at 11.

Finally, Commerce bolstered its conclusion by highlighting two scope inquiries concerning unfinished bearing parts subject to the antidumping order on

TRBs from Japan, which had been initiated based on the same petitions that gave

rise to the Order.  Id. at 10 (referring to Memorandum, "TRBs from Japan -

American NTN Bearing Manufacturing corporation (ANBM) Scope Request on

Green Turned Rings," (Green Rings Memorandum) (May 16, 1989) and

Memorandum, "Final Affirmative Determination in Scope Inquiry on Antidumping

Duty Order on Tapered Roller Bearings and Parts Thereof from Japan," (Rough

Forgings Memorandum) (Jan. 26, 1995)).  The products at issue in these prior scope

rulings, in Commerce's view, were analogous to the 2020 merchandise because they

were "destined to become fully finished TRBs" and "sold through the same channels

of trade [with] the same end-use expectations."  Id.

Commerce issued its final scope ruling on June 12, 2020.  Id. at 1.  Precision

did not challenge the ruling.

### B.    2023 Scope Ruling: Low-Carbon Steel Blanks

In 2023, Precision requested another scope inquiry under the Order, this time

identifying the products in question as "low-carbon steel blanks" (the "2023

merchandise").  Scope Ruling Application, P.R. 8 at 4 (Apr. 24, 2023) ("2023

Application").  As Precision explained, the 2023 merchandise is made from "non-

standard steel" and "sold to US manufacturers who add substantial value to the

blanks by significant further processing," a post-importation process that results in

"finished tapered roller bearings."  Id.  Throughout the 2023 Application, Precision

underscored in considerable detail how the 2023 merchandise is not bearing-grade

steel.  E.g. id. at 5–6.  Precision maintained that the non-bearing-grade nature of

the 2023 merchandise compelled the conclusion, based on the plain language of the

Order and section 351.225(k)(1) sources, that it is outside the scope of the Order.

Id. at 14–15.  Yet in summarizing the importation history of the merchandise,

Precision referred to a "2020 Scope ruling putting these parts inside the scope,"

suggesting to Commerce that Precision believed the merchandise described in the

2023 Application is covered by the 2020 Scope Ruling and the Order.  Id. at 21.  In

its rebuttal comments addressing input from the petitioner, Precision also wrote

that "[i]t was the same material in the same parts for both the 2020 and 2023 scope

requests . . . ."  Tapered Roller Bearings from China: Rebuttal Comments on

Timken's Comments on Scope Inquiry Low Carbon Blanks, P.R. 19 at 8 (July 10,

2023) ("2023 Rebuttal Comments").  Notwithstanding the apparent duplicative

nature of Precision's reframed request, Commerce initiated a new scope inquiry on

May 25, 2023.  See Antidumping Duty Order on Tapered Roller Bearings and Parts

Thereof, Finished and Unfinished, from the People's Republic of China: Deemed

Initiation of Scope Inquiry, P.R. 10 (May 25, 2023); 2023 Scope Ruling.

    In its 2023 Scope Ruling, Commerce first reviewed the plain language of the

Order: "tapered roller bearings and parts thereof, finished and unfinished, from

China."  2023 Scope Ruling at 6.  Commerce acknowledged that this language does

not address "parts made of low-carbon steel or bearing steel," but concluded that the

2023 merchandise is best characterized as "unfinished TRB parts."  Id.  Commerce

appeared to reach this conclusion based on Precision's statements in the 2023 Application about how the blanks are "destined to become finished TRBs" and "sold to US bearing manufacturers." Id. At this stage of its analysis, Commerce also observed that the plain language of the Order does not refer to "steel grade or composition," the criterion most emphasized by Precision, and determined that arguments on this point were "moot." Id. at 6, n.40. Similarly, Commerce emphasized in its plain language analysis that Precision had not articulated "an alternative commercial use" for the merchandise, or anything suggesting it is not an unfinished TRB part. Id. at 6. Cf. 2020 Scope Ruling at 8–10.

Commerce then proceeded with its analysis of section 351.225(k)(1) sources. 2023 Scope Ruling at 6. Here, Commerce determined the 2020 Scope Ruling was a prior scope ruling in the proceeding and that the 2023 merchandise equivalent to the 2020 merchandise. Id. In so concluding, Commerce agreed with the petitioner's comment, which observed that Precision had provided identical photos of the product in the 2020 Application and in the 2023 Application, suggesting the 2020 merchandise and the 2023 merchandise are indistinguishable. Id. at 3. Compare 2023 Application, P.R. 8, Ex. 2, with 2020 Application, P.R. 10 at 3.

Commerce concluded the 2023 Scope Ruling by finding that "the products subject to this inquiry are the same as the products subject to the 2020 Final Scope Ruling, and that the 2020 Final Scope Ruling is dispositive of whether [Precision's]

low-carbon steel blanks are covered by the scope of the Order." 2023 Scope Ruling

at 6–7. On November 9, 2023, Precision filed this action.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2020) and 19

U.S.C. § 1516a(a)(2)(B)(vi) (2020). Section 1581(c) provides for exclusive jurisdiction

over any civil action commenced under section 1516a. 28 U.S.C. § 1581(c). Section

1516a(a)(2)(B)(vi), provides for judicial review of a determination of "whether a

particular type of merchandise is within the class or kind of merchandise described

in an . . . antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi).

In conducting its review, the court must set aside any determination, finding, or

conclusion found "to be unsupported by substantial evidence on the record, or

otherwise not in accordance with law." Id. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.    The Parties' Contentions

    A.    Precision's Arguments

In support of its motion for judgment on the agency record, Precision

contends that Commerce erred when it found that the merchandise is within the

scope of the Order and, in doing so, expanded the scope of the Order impermissibly.

Pl. Precision Br. in Supp. of Mot. for J. on Agency R., ECF No. 17.1 (Apr. 3, 2024)

("Precision Br.") at 1.

Precision offers four reasons why Commerce's conclusion concerning the 2023 merchandise was unlawful.  Id. at 12–16. According to Precision, each of these points suggests that, under the plain language of the Order, the merchandise is a raw material "from which parts (Rings) are produced," rather than a finished or unfinished TRB part.  Id. at 12.  Precision's arguments proceed as follows:

First, Precision cites Harmonized Tariff Schedule ("HTS") subheadings it believes suggest the merchandise is not a part.  As Precision notes, these subheadings do not expressly use the term part, and instead refer to the relevant merchandise as "[s]uitable for use in the manufacture of ball or roller bearings."  Id. Precision further observes that a different HTS subheading refers to parts of bearings.  Id.  The content of these subheadings, according to Precision, "is strong evidence of the non-scope" nature of the merchandise.  Id.

Second, Precision states that historical U.S. Customs and Border Protection ("CBP") classification of its merchandise supports its view of the plain language of the Order.  Id. at 12–13.  Precision refers to numerous "intensive reviews" by CBP that resulted in the conclusion that Precision's merchandise was outside the scope of the Order.  Id. at 13.  Yet on this point, Precision also writes: "[i]n 2020 these products were provisionally moved into the order, but such decision was based on an inadequate analysis and the fact that these blanks were made of materials that do not meet the definitions of bearing steel was not considered."  Id. (citing 2020 Application and 2020 Scope Ruling).  This argument appears to acknowledge

Court No. 23-00218                                                    Page 10

explicitly that its 2020 Application and its 2023 Application concerned the same

merchandise, suggestion this litigation is merely an attempt at a do-over.[1]

      Third, Precision elaborates on the key consideration it believes rendered

Commerce's analysis in 2020 "inadequate," i.e., the non-bearing-steel nature of the

2023 merchandise.  Id. at 13.  Precision explains that the 2023 merchandise is not

made of bearing grade steel, but rather low-carbon alloy steel, which "has different

mechanical properties."  Id. at 13–14.  "If a part does not have the appropriate

mechanical properties, even if it 'looks' like a bearing part to the naked eye, it does

not function as a bearing."  Id. at 14.  In addition, Precision highlights how low

carbon alloy steel "cannot be readily heat-treated," referring to the processing step

that was the focus of the 2020 Application and the 2020 Scope Ruling.  Id.  Precision

summarizes this point by clarifying that low carbon blanks "cannot be heat-treated

in their condition as imported" and "heat-treatment is required prior to their final

conversion to a bearing part."  Id. at 15.  As with its prior points, Precision neither

addresses how this information relates specifically to a plain language analysis of

the written scope description nor attempts to locate its argument within the

framework of the analysis Commerce must perform under section 351.225(k).  Id.

_____

[1] As addressed, and acknowledged by Precision's counsel during oral argument,
there are several statements from Precision in the administrative record, not just
its briefing, that confirm the merchandise from 2020 and 2023 are the same.  See
id.; 2023 Application at 13, 21; 2023 Rebuttal Comments at 8.

Court No. 23-00218                                                    Page 11

Fourth and finally, Precision underscores the "significant processing" the 2023 merchandise must undergo "in order to be converted into a bearing part." Id. Precision also notes that such processing "adds substantial value" to the merchandise and "alters the chemistry of the steel." Id. Here, too, Precision does not attempt to root its argument in the written scope description or in the framework of analysis specified by section 351.225(k). Id. at 15–16. Indeed, despite its emphasis of steel grade and the need for additional processing, Precision acknowledges that after such processing, the merchandise becomes a "bearing part." Id. at 16. Precision concludes by asking the court to "find that the steel blanks are materials used in the production of bearings, but are not parts of bearings." Id. Beyond discussing the "significant processing" required to fashion the merchandise into a TRB part, Precision does not explain why this is different from *finishing* an unfinished TRB part or at what later point in the manufacturing process the merchandise would be considered an unfinished TRB part.

B.    The Government's Arguments

The Government correctly frames this dispute as turning on whether the 2023 Scope Ruling, in which Commerce found that the merchandise was within the scope of the Order, is supported by substantial evidence and otherwise in accordance with law. Def. United States Br. in Supp. of Resp. to Pl. Mot. for J. on Agency R., ECF No. 21 (July 12, 2024) ("Gov. Br.") at 5. The Government's position is that Commerce was reasonable in concluding that the merchandise is within the

Court No. 23-00218                                                    Page 12

scope of the Order based on consideration of the plain language of the Order and

interpretive sources under section 351.225(k)(1).  Id. at 12.  Regarding the plain

language analysis undertaken by Commerce, the Government highlights how

Commerce concluded that "unfinished TRB parts are explicitly covered" by the

written description of the scope and the merchandise is "destined to become" a

finished TRB.  Id. at 14 (citing 2023 Scope Ruling at 6.

     The Government then addresses Commerce's consideration of the 2020 Scope

Ruling as a primary interpretive source under section 351.225(k)(1) — specifically,

as a prior scope ruling in the proceeding.  Id. at 11–12, 14–15.  The Government

contends Commerce was reasonable in reviewing the 2020 Scope Ruling as a (k)(1)

source because it relied on an "admission" in the 2023 Application, photographs in

the 2020 Application and the 2023 Application, and Precision's failure to assert that

the merchandise is not covered by the 2020 Scope Ruling.  Id. at 15; see 2020

Application at 45, 2023 Application at 23, 28; see also Precision Br. at 13.

     For similar reasons, the Government argues that Precision's challenge of the

2023 Scope Ruling is in fact "an impermissible collateral attack" on the 2020 Scope

Ruling.  Gov. Br. at 16.  The Government refers to the statements from Precision

that suggest Precision itself views the merchandise from 2020 and 2023 as one in

the same and, separately, to the portion of Precision's briefing that appears to focus

on alleged deficiencies in the 2020 Scope Ruling, rather than the decision from

Commerce that is the focus of this litigation.  Id. (citing Precision Br. at 13).  In

addition, the Government observes that Precision "identifies no subsequent Commerce ruling or court decision that calls the 2020 Scope Ruling into question." Id.  According to the Government, Precision "provides no basis" for challenging either the 2020 Scope Ruling itself or its decisive interpretive role as a section 225.351(k)(1) source in Commerce's issuance of the 2023 Scope Ruling.  Id.

The Government also responds to Precision's contentions.  Regarding Precision's first point, the Government argues that the written description of the scope of the Order is dispositive and, consequently, HTS subheadings cannot be read to contradict the Order's plain language.  Id. at 17 (citing Saha Thai Steel Pipe Pub. Co. Ltd. v. United States, 101 F.4th 1310, 1328 (Fed. Cir. 2024).  As the Government summarizes, the language of certain HTS provisions that Precision prefers "cannot supersede the written description" in the Order.  Id. at 17–18.

On Precision's second point, the Government's position is that the CBP documents cited by Precision are secondary interpretive sources under section 351.225(k)(1)(ii), sources which Commerce did not need to afford weight due to the interpretive clarity provided by its (k)(1)(i) review of the 2020 Scope Ruling.  Id. at 18.  The Government notes that, insofar as Precision intended to suggest Commerce should have privileged CBP's view under subsection (k)(1)(ii), that provision expressly provides that (k)(1)(i) sources control "in the event of a conflict."  Id.; see § 351.225(k)(1).  Thus, the Government posits, CBP's view is inapposite.

In response to the third and fourth points raised by Precision, the Government suggests that steel grade and additional processing are irrelevant considerations based on the plain language of the Order, which makes no reference to material composition or processing steps.  Gov. Br. at 18–20.  The Government also highlights Commerce's discussion of how, in 2020, it had concluded that the green-machining and heat-treatment processing steps did not prevent the 2020 merchandise from falling within the scope of the Order.  Id. at 19.  In the same vein, the Government notes that Precision's focus on steel grade and value added from processing appear to be arguments aimed at undermining the analysis in the 2020 Scope Ruling, rather than the 2023 Scope Ruling.  Id.  The Government bolsters this observation by highlighting sources cited by Precision — namely, publications from the International Trade Commission ("ITC") — that Commerce had acknowledged in the 2020 Scope Ruling.  Id. at 19–20; see 2020 Scope Ruling at 11.  Finally, like its response regarding the reference to CBP's historical treatment of Precision's products under the Order, the Government objects to Precision's discussion of "significant processing" as an attempt to shoehorn an analysis of the factors specified by section 351.225(k)(2) into a review that Commerce reasonably limited to consideration of (k)(1) sources.[2]  Id. at 20–21.

---

[2]  Given Commerce's reliance upon the 2020 Scope Ruling in reaching its determination in the 2023 Scope Ruling, it is worth noting that in the 2020 Scope Ruling, Commerce performed an extensive analysis under section 351.225(k)(2) in which it considered additional information, such as the additional processing of the

Thus, according to the Government, Commerce correctly relied upon the plain language of the Order and a dispositive (k)(1) source — the 2020 Scope Ruling — to find the merchandise within the scope. Precision's attempts to undermine that determination, in turn, reflect a combination of untimely attacks on the 2020 Scope Ruling, rather than the 2023 Scope Ruling, and references to information that Commerce was not required to include in its analysis. Id. at 17–21.

A few points raised in Precision's reply brief merit mention. First, Precision acknowledges that the scope of the Order does "not differentiate between bearing and non-bearing steel." Pl. Precision Reply Br. in Supp. of Mot. for J. on Agency R., ECF No. 24 (Aug. 30, 2024) ("Precision Reply Br.") at 2. Second, Precision reiterates its arguments regarding the importance of steel grade and the significant processing required to fashion the merchandise into a finished TRB part. Id. at 5–6. In doing so, however, Precision again declines to offer any actual or potential examples of non-TRB end-uses for the merchandise. Instead, it reiterates its own characterization of the merchandise as a "raw material," a term that does not appear in plain language of the scope of the Order. Id. at 6. Precision uses the term "raw material" without reference to a definition or citation that might clarify its relationship to the scope description set forth in the Order. Id.

_____

part in the United States by bearing manufacturers, and concluded that the 2020 merchandise was within the scope of the Order. 2020 Scope Ruling at 7–11.

Precision's reply brief also addresses the Government's contention that the 2023 Application and this litigation represent an untimely effort to challenge the 2020 Scope Ruling rather than a novel scope ruling request for distinct merchandise. Id. at 4–5. After rejecting this view (and without addressing the Government's citations to Precision's own statements linking the 2020 Scope Ruling and the merchandise), Precision suggests "there is ***nothing more than conjecture*** that the two sets of products covered are identical." Id. at 5 (emphasis added).

## II.   Legal Standard

When questions arise as to whether merchandise is covered by the scope of an antidumping order, Commerce will conduct a scope inquiry and issue a scope ruling. 19 C.F.R. § 351.225(a) (2024). Commerce has broad authority in interpreting its own antidumping orders. Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382 (Fed. Cir. 2005). In determining whether a product falls within the scope of such an order, Commerce considers "the language of the scope and may make its determination on this basis alone if the language of the scope, including descriptions of merchandise expressly excluded from the scope, is dispositive." § 351.225(k)(1). "If the scope is unambiguous, it governs." Meridian Prods., LLC v. United States, 851 F.3d 1375, 1381 (Fed. Cir. 2017).

"In reviewing the plain language of a duty order," Commerce must consider the (k)(1) sources. § 351.225(k); see Meridian, 851 F.3d at 1382. The (k)(1) sources include the description of the merchandise considered by Commerce and the

Court No. 23-00218                                                              Page 17

Commission when crafting the scope, as well as previous determinations made by

Commerce and the Commission. § 351.225(k)(1)(i); see Meridian, 851 F.3d at 1382.

    If Commerce "determines that the sources under paragraph (k)(1) of this

section are not dispositive," Commerce will then consider the (k)(2) factors.

§ 351.225(k)(2)(i); see, e.g., 2020 Scope Ruling. Thus, the (k)(1) sources assist

Commerce in interpreting the scope language, while the (k)(2) factors assist

Commerce in determining if the language describes the product at issue. All of

Commerce's analysis, however, must be done in such a way that the scope is not

changed, and that the order is not interpreted in a manner contrary to its terms.

E.g. Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001).

    The plain meaning of an antidumping order is a question of law, while the

question of whether certain merchandise falls within the scope of such an order is a

question of fact reviewed for substantial evidence. See Worldwide Door

Components, Inc. v. United States, 119 F.4th 959, 968 (Fed. Cir. 2024) (citing

Meridian, 851 F.3d at 1382). Substantial evidence is any relevant evidence that one

might reasonably accept as adequate to support a conclusion. See Worldwide Door

Components, 119 F.4th at 968. In the context of a scope ruling issued by

Commerce, substantial evidence review is limited to the administrative record in

the proceeding before Commerce, including any relevant evidence therein. See id.

Commerce's conclusion may be supported by substantial evidence even if it is

possible to draw two inconsistent conclusions from the record evidence. See id.

Court No. 23-00218                                                                   Page 18

## III.  Analysis

As discussed above, this dispute boils down to whether Commerce's
determination in the 2023 Scope Ruling is supported by substantial evidence and
otherwise in accordance with law.  Thus, the court considers whether Commerce
reasonably concluded that the merchandise, described by Precision as "low-carbon
steel blanks," falls within the pertinent part of the written description of the scope
as set forth in the Order: "tapered roller bearings and parts thereof, finished and
unfinished."  2023 Scope Ruling at 2.  Here, the court concludes Commerce's
determination is supported by substantial evidence and otherwise in accordance
with law.  Id. at 7.

Commerce's approach to the first part of its analysis, a review of the
language of the Order, was reasonable and supported by substantial evidence.
Commerce correctly acknowledged — and both parties agree — that the written
description does not explicitly address "parts made of low-carbon steel or bearing
steel."  Id. at 6; see Precision Reply Br. at 2.  Because steel composition is absent
from the written description of the Order, Commerce declined to consider
Precision's comments relating to steel grade when evaluating the language of the
Order.  2023 Scope Ruling at 6, n.40.  Commerce then reasoned that the decisive
interpretive question was whether "low-carbon steel blanks" were "unfinished TRB
parts."  Id. at 6.  Commerce also cited to Precision's 2023 Scope Application, in
which Precision stated that the 2023 merchandise is sold to "US bearing

manufacturers" that employ "significant further processing" in order "to make a finished bearing," and identified no alternative end uses or applications.  Id. (citing 2023 Scope Application at 15.  Based on this information, and absent language suggesting otherwise, it was reasonable for Commerce to conclude initially that low-carbon steel blanks were best understood as unfinished TRB parts.  Id.

To test its first instinct regarding the plain language of the Order, Commerce turned to primary interpretive sources under section 351.225(k)(1), "including prior scope rulings in this proceeding."  2023 Scope Ruling at 6.  Commerce noted that the 2020 Scope Ruling, which involved Precision, the Order, and merchandise that was "green machined, but not heat-treated," appeared on point.  Commerce also observed that Precision suggested the same when it stated in its 2023 Application: "These blanks were moved within the scope in 2020."  Id. at 6 (citing 2023 Application at 13.[3]  Commerce then referred to comments from the petitioner and photographs in the 2020 Application and the 2023 Application, concluding that the 2023 Application and the 2020 Scope Ruling concerned "the same products."  Id. Finally, Commerce highlighted that as of the 2023 inquiry, Precision had made "no assertions that the products here are different" from those examined in 2020.  Id. Thus, based on scrutiny of the 2020 Application, the 2020 Scope Ruling, the 2023

_____

[3] Commerce also had before it at least one additional citation expressly suggesting its 2023 inquiry concerned the same merchandise as the 2020 Scope Ruling.  See 2023 Rebuttal Comments at 8 ("It was the same material in the same parts for both the 2020 and 2023 scope requests . . . .").

Court No. 23-00218                                                    Page 20

Application, interested party comments, and the absence of contradictory

statements from Precision, Commerce concluded the merchandise was the same as

the 2020 merchandise.  Id. at 6.  Accordingly, as in 2020, Commerce found the 2023

merchandise fell within the scope of the Order.  Id. at 7.

     In short, Commerce acted reasonably in issuing the 2023 Scope Ruling.  In its

initial review of the written scope description, Commerce identified the most

intuitively applicable language in the Order — i.e., "parts thereof, finished or

unfinished" — and moved forward with its analysis from there.  Recognizing

implicitly that it could not fairly characterize the merchandise as a "finished" TRB

part, Commerce considered whether and to what extent it might be "unfinished."  In

doing so, Commerce observed that Precision had identified bearing manufacturers

as the only consumers of the merchandise, described a process by which the

merchandise would be used "to make a finished bearing," and omitted any mention

of even hypothetical or potential alternative uses.  From a fair reading of the Order

and Precision's own statements, then, Commerce reached the initial interpretation

that the merchandise was an unfinished TRB part.

     Next, and pivotally, Commerce explained that it had conducted a scope

inquiry involving the same importer, the same Order, and (seemingly) the same

merchandise only three years prior.  That the 2020 scope inquiry involved the same

importer (Precision), the same antidumping order (the Order), and a similar

category of merchandise is not disputed.  Nor, until recently, did any party cast

Court No. 23-00218                                                      Page 21

doubt on whether the 2023 merchandise was the same as the 2020 merchandise.[4]
In the 2023 Application, Precision stated: "These blanks were moved within the
scope in 2020." 2023 Application at 13.  Commerce reasonably relied on this
statement in the 2023 Scope Ruling. 2023 Scope Ruling at 6.  Notwithstanding
Precision's unclear briefing on this point, it was more than reasonable for
Commerce to rely upon Precision's own statements and photographs in concluding
that the merchandise was the same as the 2020 merchandise and, in turn, that the
merchandise was within the scope of the Order.  This is not a case in which
Commerce faced "two inconsistent yet reasonable conclusions," Saha Thai Steel
Pipe, 101 F.4th at 1331, but rather one in which Precision's own statements and
photographs led inexorably to the conclusion reached by Commerce.

        As discussed above, Commerce made the express factual finding that the
merchandise was the same as the 2020 merchandise.  2023 Scope Ruling at 6.  It
did so based on an administrative record replete with evidence that supported that
conclusion and devoid of indications to the contrary.  See, e.g., 2023 Application at
13, Ex. 2; 2020 Application at 3.  Based on that finding, Commerce resolved to rely
upon the 2020 Scope Ruling, which contained extensive analysis of the subject
merchandise under both subsection (k)(1) and (k)(2).  2023 Scope Ruling at 6–7; see

_____

[4] After stating in its first brief, that "[i]n 2020 these products were provisionally
moved into the order," Precision Br. at 13, in its reply brief, Precision equivocated:
"while there is some commonality, there is nothing more than conjecture that the
two sets of products covered are identical." Precision Reply Br. at 5.

Court No. 23-00218                                                        Page 22

2020 Scope Ruling.  In the absence of a timely, successful challenge of the 2020

Scope Ruling by Precision, it was reasonable for Commerce to root its 2023

determination in the analysis it performed for the same merchandise in 2020.

     For the foregoing reasons, Plaintiff's Motion for Judgment on the Agency

Record is **DENIED** and Commerce's determination is **SUSTAINED**.  Judgment will

enter accordingly.  **SO ORDERED.**


              /s/     Joseph A. Laroski, Jr.
                              Judge

Dated: February 25, 2025
       New York, New York